**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **CAROLYN JUREWICZ,** *et al.*, | |
| **Plaintiffs,** | |
| **v.** | **Civil Action No. 10-1683 (JEB)** |
| **UNITED STATES DEPARTMENT OF AGRICULTURE,** | **(Consolidated with Civil Action No. 11-707 (JEB))** |
| **Defendant,** | |
| **and** | |
| **THE HUMANE SOCIETY OF THE UNITED STATES,** | |
| **Defendant-Intervenor.** | |

<u>**MEMORANDUM OPINION**</u>

In this "reverse-FOIA" case, Plaintiffs – Missouri dog breeders and dealers – seek to prevent the U.S. Department of Agriculture from releasing information requested by the Humane Society of the United States under the Freedom of Information Act. Specifically, Plaintiffs want to stop the USDA from disclosing the number of dogs that they buy and sell each year and their annual revenue from dog sales. Plaintiffs claim that two FOIA exemptions shield that information: Exemption 4, which protects confidential financial information, and Exemption 6, which protects private records whose release would constitute a clearly unwarranted invasion of personal privacy. Disagreeing with Plaintiffs, the USDA concluded that no FOIA exemption covers the information in dispute. Plaintiffs then filed suit in this Court, and all parties have now moved for summary judgment. Because the Court concludes that the USDA's conclusion was

not arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law, the Court will grant the USDA's and the Humane Society's Motions and deny Plaintiffs'.

## I.      Background

### A.      Statutory and Regulatory Framework

The dispute in this case arises from requirements in the Animal Welfare Act.  A brief discussion of that Act and the procedural underpinnings of reverse-FOIA actions is thus a helpful point of departure.

#### 1.      *The Animal Welfare Act*

The Animal Welfare Act requires "the humane handling, care, treatment, and transportation of animals by dealers, research facilities, and exhibitors."  7 U.S.C. § 2143(a)(1); see also 9 C.F.R. §§ 3.1-3.19 (setting standards for dogs and cats).  To give those requirements teeth, Congress directs each "dealer" of "animals" to obtain a "license" from the USDA.  7 U.S.C. § 2134.  An "animal" includes any dog that "is being used, or is intended for use, for research, testing, experimentation, or exhibition purposes, or as a pet," or for "hunting, security, or breeding purposes."  7 U.S.C. § 2132(g).  A "dealer" includes any entity (other than a retail pet store) earning more than $500 per year that "buys, or sells, or negotiates the purchase or sale" of domestic dogs for such purposes.  7 U.S.C. § 2132(f).

Congress directs the USDA to issue such a license "upon application therefor in such form and manner as [the USDA] may prescribe and upon payment of such fee established" pursuant to § 2153.  7 U.S.C. § 2133.  Section 2153, in turn, directs the USDA to charge, assess, and collect a fee that is "reasonable" and "adjusted on an equitable basis taking into consideration the type and nature of the operations to be licensed."  7 U.S.C. § 2153.  The USDA

requires dealers to renew their licenses each year by paying a license fee and filing a report. <u>See</u> 9 C.F.R. § 2.5(b); <u>see also</u> 9 C.F.R. § 2.6 (fee); 9 C.F.R. § 2.7 (report).

The license-renewal fees range from $40 to $760. <u>See</u> 9 C.F.R. § 2.6(c) tbl.1. The fee depends on how much a dealer derived from regulated activities in the last year: for breeders, gross revenue from dog sales, <u>see</u> 9 C.F.R. § 2.6(b)(1); for brokers and auction operators, commissions from dog sales, <u>see</u> 9 C.F.R. § 2.6(b)(3); and for other dealers, the difference between the sale price and the purchase price of dogs sold. <u>See</u> 9 C.F.R. § 2.6(b)(2). The Animal and Plant Health Inspection Service (APHIS) within the USDA collects these fees.

The annual report that the USDA requires is called APHIS Form 7003. For the most part, the Form requests standard information from the dealer, such as name and address. But Block 8 (or sometimes Block 10) of the Form also requires each dealer to disclose more sensitive information: the number of dogs bought and sold in the last year; the gross revenue from dog sales in the last year; and, for nonbreeder dealers, the difference between the sale price and the purchase price of the dogs sold in the last year. <u>See, e.g.</u>, Admin. Rec. (A.R.) 7, 21-23 (redacted Form 7003s). For convenience, the Court will call this information the "Block 8 information." It is this information that Plaintiffs do not wish disclosed.

### 2.    *The Freedom of Information Act*

FOIA provides that "each agency, upon any request for records which (i) reasonably describes such records and (ii) is made in accordance with published rules . . . , shall make the records promptly available to any person." 5 U.S.C. § 552(a)(3)(A). But FOIA exempts certain matters from that general disclosure requirement. Two FOIA exemptions are relevant here: Exemption 4, which covers matters that are "trade secrets and commercial or financial information obtained from a person and privileged or confidential," 5 U.S.C. § 552(b)(4); and

Exemption 6, which covers "personnel and medical files and similar files the disclosure of which would constitute a clearly unwarranted invasion of personal privacy."  5 U.S.C. § 552(b)(6). Plaintiffs forfeited any challenge based on Exemption 3 by ignoring it in their Motion.  See McFadden v. Ballard Spahr Andrews & Ingersoll, LLP, 611 F.3d 1, 6 (D.C. Cir. 2010).

The FOIA scales are weighted toward disclosure.  The Supreme Court has "often noted the Act's goal of broad disclosure and insisted that the exemptions be given a narrow compass." Milner v. Dep't of the Navy, 131 S. Ct. 1259, 1265 (2011) (internal quotation marks omitted).

When an agency decides that no FOIA exemption applies, "[a] person whose information is about to be disclosed pursuant to a FOIA request may file a 'reverse-FOIA action' and seek to enjoin the Government from disclosing it."  Canadian Commercial Corp. v. Dep't of the Air Force, 514 F.3d 37, 39 (D.C. Cir. 2008).  Decisions to disclose information pursuant to FOIA "are in the nature of informal adjudications, and as such are reviewable under the generally applicable standards of [5 U.S.C.] § 706."  Occidental Petroleum Corp. v. SEC, 873 F.2d 325, 337 (D.C. Cir. 1989) (citation and internal quotation marks omitted); see also United Techs. Corp. v. Dep't of Def., 601 F.3d 557, 559 (D.C. Cir. 2010) ("When an agency determines, pursuant to a FOIA request, to disclose information gathered from a non-governmental source, the source may contest the disclosure as arbitrary and capricious or not in accordance with law under the Administrative Procedure Act, 5 U.S.C. §§ 702, 706(2).").  Thus, a reviewing court shall "hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706.

B.      Factual and Procedural History

In 2009, the Humane Society submitted multiple FOIA requests to the USDA.  It asked for recent Forms filed by certain dog dealers, particularly dealers in Missouri.  See Letter from Tracie Letterman, Humane Soc'y, to Tonya Woods, USDA (Aug. 20, 2009), A.R. 1; Letter from Katie Smith, Humane Soc'y, to Woods (Oct. 5, 2009), A.R. 24; Letter from Bettina Camcigil, Humane Soc'y, to Woods (Dec. 15, 2009), A.R. 164.  The requests included the Forms of the three individual Plaintiffs – Carolyn Jurewicz, Sharon Lavy, and the Hunte Corporation – and the Forms of some members of the associational Plaintiff – the Missouri Pet Breeders Association. Those FOIA requests have since wound along a twisting track.

At first, the USDA concluded that Exemptions 4 and 6 covered the Block 8 information and redacted Block 8 before releasing the Forms.  See Letter from Celeste Camp, USDA, to Letterman (Apr. 8, 2010), A.R. 5; Letter from Camp to Letterman (Apr. 12, 2010), A.R. 19; Letter from Camp to Smith (Jan. 8, 2010), A.R. 28; Letter from Camp to Smith (Apr. 7, 2010), A.R. 96; Letter from Camp to Camcigil (Mar. 2, 2010), A.R. 167; Letter from Camp to Camcigil (Apr. 8, 2010), A.R. 702; Letter from Camp to Camcigil (Apr. 20, 2010), A.R. 369.  The USDA also withheld Social Security numbers, third-party names, and signatures.  No one has challenged those withholdings.  See Letter from Woods to Breeder or Dealer 2 n.1 (Feb. 17, 2012) [hereinafter "Final USDA Letter"], A.R. 5526 n.1.  Believing the Block 8 redactions improper, the Humane Society brought a FOIA suit in this Court, case number 10-cv-1683.

While that suit was pending, however, the USDA revisited its stance.  It first sought comments from each dealer whose Forms were requested, asking whether the dealer believed that releasing the Block 8 information would cause the dealer substantial competitive harm and, if so, how.  See, e.g., Letter from Woods to Breeder or Dealer (Nov. 22, 2010), A.R. 1006.  After

reviewing those comments, the USDA reversed its decision and concluded that neither

Exemption applied.  The USDA then sent letters to the dealers explaining its new decision and

warning that it would release the Block 8 information unless the dealers filed suit.  <u>See</u> Letter

from Woods to Dealer or Breeder (Mar. 17, 2011), A.R. 4550.  Plaintiffs then filed their reverse-

FOIA suit, case number 11-cv-707.  The Court has since consolidated the two actions.  <u>See</u>

Minute Order, Aug. 1, 2011.

      The matter was still not yet ripe for decision.  Instead, the USDA opted once again to

reexamine its decision instead of litigating in court – this time after discovering an apparent

inaccuracy in its most recent decision letter.  The USDA thus moved for a voluntary remand, and

the Court granted the motion.  <u>See</u> Minute Order, Dec. 9, 2011.  Through Plaintiffs, the USDA

then sent another round of letters to the dealers, seeking further comment on the release of the

Block 8 information.  <u>See</u> Letter from Woods to Breeder/Dealer Licensee (Dec. 19, 2011), A.R.

5075.  But this time, after receiving comments, the USDA held firm that no FOIA exemption

covers the Block 8 information.  <u>See</u> Final USDA Letter, A.R. 5525.  Plaintiffs then renewed

their reverse-FOIA action, claiming that multiple FOIA exemptions cover that information.  All

parties have now filed Motions for Summary Judgment.

## II.   Legal Standard

      Summary judgment may be granted if "the movant shows that there is no genuine dispute

as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P.

56(a); <u>see also</u> <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 247-48 (1986); <u>Holcomb v.

Powell</u>, 433 F.3d 889, 895 (D.C. Cir. 2006).  A fact is "material" if it is capable of affecting the

substantive outcome of the litigation.  <u>See</u> <u>Liberty Lobby</u>, 477 U.S. at 248; <u>Holcomb</u>, 433 F.3d at

895.  A dispute is "genuine" if the evidence is such that a reasonable jury could return a verdict

for the nonmoving party.  See Scott v. Harris, 550 U.S. 372, 380 (2007); Liberty Lobby, 477

U.S. at 248; Holcomb, 433 F.3d at 895.

Although styled Motions for Summary Judgment, the pleadings in this case more

accurately seek the Court's review of an administrative decision.  The standard set forth in Rule

56(c), therefore, does not apply because of the limited role of a court in reviewing the

administrative record.  See Sierra Club v. Mainella, 459 F. Supp. 2d 76, 89-90 (D.D.C. 2006)

(citing Nat'l Wilderness Inst. v. Army Corps of Eng'rs, 2005 WL 691775, at *7 (D.D.C. 2005);

Fund for Animals v. Babbitt, 903 F. Supp. 96, 105 (D.D.C. 1995), amended on other grounds,

967 F. Supp. 6 (D.D.C. 1997)).  "[T]he function of the district court is to determine whether or

not as a matter of law the evidence in the administrative record permitted the agency to make the

decision it did."  Id. at 90 (citation omitted).  "Summary judgment thus serves as the mechanism

for deciding, as a matter of law, whether the agency action is supported by the administrative

record and otherwise consistent with the APA standard of review."  Id. (citing Richards v. INS,

554 F.2d 1173, 1177 & n.28 (D.C. Cir. 1977), cited in Bloch v. Powell, 227 F. Supp. 2d 25, 31

(D.D.C. 2002), aff'd, 348 F.3d 1060 (D.C. Cir. 2003)).

The Administrative Procedure Act "sets forth the full extent of judicial authority to

review executive agency action for procedural correctness."  FCC v. Fox Television Stations,

Inc., 556 U.S. 502, 513 (2009).  It requires courts to "hold unlawful and set aside agency action,

findings, and conclusions" that are "arbitrary, capricious, an abuse of discretion, or otherwise not

in accordance with law."  5 U.S.C. § 706.  This is a "narrow" standard of review as courts defer

to the agency's expertise.  Motor Vehicle Mfrs. Ass'n of the U.S. v. State Farm Mut. Auto. Ins.

Co., 463 U.S. 29, 43 (1983).  An agency is required to "examine the relevant data and articulate a

satisfactory explanation for its action including a rational connection between the facts found and

the choice made." Id. (internal quotation marks omitted).  The reviewing court "is not to

substitute its judgment for that of the agency," id., and thus "may not supply a reasoned basis for

the agency's action that the agency itself has not given."  Bowman Transp., Inc. v. Ark.-Best

Freight Sys., Inc., 419 U.S. 281, 285-86 (1974).  Nevertheless, a decision that is not fully

explained may be upheld "if the agency's path may reasonably be discerned."  Id. at 286.

## III.   Analysis

Plaintiffs contend that the USDA erred in concluding that neither FOIA Exemption 4 nor

Exemption 6 covers the Block 8 information.  The Court will consider each in turn.  Before

proceeding, it bears mention that even when an exemption applies, FOIA generally leaves an

agency discretion to release the information.  See CNA Fin. Corp. v. Donovan, 830 F.2d 1132,

1134 n.1 (D.C. Cir. 1987).  But because the USDA's decision here rested purely on its

determination that no exemption applied, the possibility of discretion plays no role in judicial

review.  See SEC v. Chenery Corp., 318 U.S. 80, 87 (1943) ("The grounds upon which an

administrative order must be judged are those upon which the record discloses that its action was

based.").

### A.   FOIA Exemption 4

Exemption 4 covers matters that are "trade secrets and commercial or financial

information obtained from a person and privileged or confidential."  5 U.S.C. § 552(b)(4).  Here,

all agree that the Block 8 information – information about volume of sales and gross revenue – is

"commercial or financial," is "obtained from a person," and is not "privileged."  See Final

USDA Letter 8, A.R. 5532.  The sole remaining question, therefore, is whether the Block 8

information is "confidential."  Under Circuit precedent, to be "confidential," disclosure must be

likely "to cause substantial harm to the competitive position of the person from whom the

information was obtained." <u>Critical Mass Energy Project v. NRC</u>, 975 F.2d 871, 878 (D.C. Cir.

1992) (*en banc*) (citation omitted).  And a substantial competitive harm "must flow from the

affirmative use of proprietary information <u>by competitors</u>." <u>United Techs.</u>, 601 F.3d at 563

(emphasis added) (internal quotation marks and brackets omitted).  To sum up that chain:

Exemption 4 applies here if Plaintiffs' competitors would be likely to use the Block 8

information to cause Plaintiffs harm.

In its final decision, the USDA concluded that the Block 8 information was not

"confidential" because its release was unlikely to cause substantial competitive harm.  <u>See</u> Final

USDA Letter 12, A.R. 5536.  Dealers submitting comments had asserted two harms.  First,

competitors could divide the revenue from dog sales by the number of dogs sold – both figures

disclosed in Block 8 – to calculate, and then undercut, a dealer's per-dog price.  <u>See</u> <u>id.</u> at 8-9,

A.R. 5532-33.  Second, competitors could use the number of dogs bought and sold to gauge the

size and growth of a dealer's operation.  <u>See</u> <u>id.</u> at 9-10, A.R. 5533-34.  The USDA disagreed,

saying that disclosure of the Block 8 information would offer minimal aid to competitors.  Most

importantly, the USDA pointed out that similar information was already in the public domain:

The fee each dealer pays to renew its license reflects the dealer's revenue from regulated

activities, so competitors can already make ballpark estimates of an operation's net income.  <u>See</u>

<u>id.</u> at 11, A.R. 5535.  And annual APHIS inspection reports "show the animal inventory at the

time of inspection," so competitors already have some sense of the size and growth of an

operation as well.  <u>Id.</u> at 10, A.R. 5334.  The USDA concluded, moreover, that too many other

variables affect each dog's price – "including breed, dog quality, age, and market demands" – to

make crude revenue-divided-by-dogs-sold calculations useful.  <u>Id.</u> at 9, A.R. 5533.  Finally, the

USDA found the Block 8 information stale because the Form "asks for the previous business

year's information and does not necessarily reflect on the current prices being obtained by the licensees with different animals." Id.

"In reviewing an agency's determination as to substantial competitive harm," the D.C. Circuit has recognized that "predictive judgments are not capable of exact proof"; as a result, a court will "generally defer to the agency's predictive judgments as to the repercussions of disclosure. If a reverse-FOIA movant has made a positive showing of competitive harm from disclosure, however, an agency's unelaborated contrary conclusion does not suffice." United Techs., 601 F.3d at 563 (citations and internal quotation marks omitted).

Plaintiffs allege that the USDA committed two errors in determining to disclose the contested information. First, Plaintiffs claim that no record evidence shows that the fees paid by dealers are publicly available. The facts, however, are directly to the contrary: even with the redactions that Plaintiffs seek, the Forms at issue in these very FOIA requests reveal the fee amount paid. See, e.g., A.R. 17, 100, 704; see also Memo from Woods (May 9, 2012), A.R. 5540 (Director of APHIS's FOIA Office, in memo postdating Final USDA Letter, stating that "[i]n my experience, APHIS has routinely released the amount of fees paid in response to FOIA requests"). Second, Plaintiffs assert that the USDA failed to address "the numerous comments in the record showing that the purpose of [the Humane Society's] request for information is to destroy the business[es]" of Missouri dealers. Pls.' Mot. at 40. But as the USDA correctly explained, those comments have nothing to do with substantial competitive harm because they do not allege any injury that would "flow from the affirmative use of proprietary information by competitors." United Techs., 601 F.3d at 563 (emphasis added) (citation and brackets omitted); see Final USDA Letter 11, A.R. 5535.

Plaintiffs' Reply Brief broadens the attack on the USDA's Exemption 4 determination. By not raising those objections in their opening brief, however, Plaintiffs have forfeited them. See Nat'l Steel & Shipbuilding Co. v. NLRB, 156 F.3d 1268, 1273 (D.C. Cir. 1998).  In any event, the objections do not alter the outcome.  Contrary to Plaintiffs' claims, the USDA never required Plaintiffs to show an actual substantial harm.  See Final USDA Letter 8, A.R. 5532 ("the test for confidentiality under Exemption 4 is whether release of the information is likely to cause substantial harm to the competitive position of the person from whom the information was obtained") (emphasis added) (internal quotation marks and ellipsis omitted).  Nor did the USDA rule out substantial competitive harm when many variables affect the price.  Indeed, there would be competitive harm if competitors could complete the "financial puzzle" by combining the Block 8 information with other pieces of information to determine how a dealer prices its dogs. See Pls.' Reply at 46-47.  Yet there is no indication here that competitors have those other puzzle pieces.  So the USDA was not arbitrary and capricious in concluding on the facts of this case that crude price-per-dog estimates would not offer competitors much help.  See Final USDA Letter 9, A.R. 5533.  Finally, the Court agrees with Plaintiffs that year-old pricing data generally has more value than the USDA suggests, but this point is in no way dispositive.  As Plaintiffs have made no "positive showing of competitive harm from disclosure" here, and because "predictive judgments are not capable of exact proof," the Court will follow established practice and "defer to the agency's predictive judgments as to the repercussions of disclosure."  United Techs., 601 F.3d at 563 (citations and internal quotation marks omitted).

The USDA's determination that Exemption 4 does not apply here, therefore, was not "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A).

B. <u>FOIA Exemption 6</u>

Exemption 6 covers "personnel and medical files and similar files the disclosure of which would constitute a clearly unwarranted invasion of personal privacy." 5 U.S.C. § 552(b)(6). The parties agree that the Form's Block 8 information qualifies as a "similar file[]" under Exemption 6. <u>See</u> <u>Multi Ag Media LLC v. USDA</u>, 515 F.3d 1224, 1228-29 (D.C. Cir. 2008) ("Exemption 6 applies to financial information in business records when the business is individually owned or closely held, and the records would necessarily reveal at least a portion of the owner's personal finances.") (internal quotation marks omitted). In dispute is whether disclosure of the Block 8 information "would constitute a clearly unwarranted invasion of personal privacy."

To resolve this question, the Court first considers whether a substantial privacy interest is at stake. After so determining, the Court then assesses whether a competing public interest exists. As those interests collide here, the Court must perform a balancing test – the outcome of which ultimately favors disclosure. At each step, the Court is deciding only whether the USDA's decision was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

  1. *Private Interests*

The threshold question for Exemption 6 is "whether disclosure of the files would compromise a substantial, as opposed to *de minimis*, privacy interest, because if no significant privacy interest is implicated FOIA demands disclosure." <u>Multi Ag Media</u>, 515 F.3d at 1229 (internal quotation marks, ellipsis, and brackets omitted). "Substantial" here "means less than it might seem. A substantial privacy interest is anything greater than a *de minimis* privacy interest." <u>Id.</u> at 1229-30. "Finding a substantial privacy interest does not conclude the inquiry; it only moves it along to the point where we can address the question whether the public interest in

disclosure outweighs the individual privacy concerns."  Id. at 1230 (citation and internal

quotation marks omitted).

Block 8 contains two types of information.  First, it has revenue information – the

dealer's gross revenue from dog sales (for breeders) or the difference between the sale price and

the purchase price of dogs sold that year (for other dealers).  Because the revenue information

could shed light on a dealer's personal finances, the USDA concluded that its disclosure would

compromise more than a *de minimis* privacy interest.  But the USDA also stressed that the most

intimate information would remain in the shadows: Block 8 "shows only the gross income and

not net profit after operating expenses and other costs are considered; therefore it does not

provide a complete picture of the individual's finances."  Final USDA Letter 5, A.R. 5529.

Second, Block 8 contains volume information – the number of dogs bought and sold each

year.  For the volume information, the USDA gave no clear answer to the threshold *de*

*minimis*/substantial question.  On the one hand, the USDA labeled the privacy interest in the size

of a dealer's operation "negligible."  Id.  And it found the already negligible interest further

diminished by "inspection reports posted online," which reveal similar information – the number

of dogs at the facility on inspection day.  Id.  On the other hand, the USDA did not stop at the

threshold; instead, it proceeded to weigh the private interest in the volume information against

the public interests in disclosure.  See id. at 7, A.R. 5531.  The USDA now argues that the

privacy interest in the volume information is *de minimis*.  But agency action must stand and fall

on the reasoning in the decision under review – not after-the-fact justifications conceived in

litigation.  See Chenery, 318 U.S. at 87-88.  The Court concludes that the best reading of the

agency decision here is that the USDA found more than a *de minimis* privacy interest.

Disclosure of both portions of information in Block 8 thus implicates Exemption 6 and triggers an examination of the public interests involved.

2. *Public Interests*

Before balancing those substantial private interests against the public interests in disclosure, there must be proper public interests to even put on the scales. The "only relevant public interest in disclosure to be weighed in this balance is the extent to which disclosure would serve the core purpose of the FOIA, which is contributing significantly to public understanding of the operations or activities of the government." Dep't of Def. v. FLRA, 510 U.S. 487, 495 (1994) (emphasis in original) (internal quotation marks and brackets omitted); see also DOJ v. Reporters Comm. for Freedom of the Press, 489 U.S. 749, 772-73 (1989); Multi Ag Media, 515 F.3d at 1231.

Here, the USDA identified three public interests served by disclosure. First, disclosure would help the public decide whether the USDA has followed Congress's directives "to collect reasonable fees for licenses issued" and "to assess the fee on an equitable basis." See Final USDA Letter 6, A.R. 5530 (citing 7 U.S.C. § 2253). Second, disclosure would help the public gauge the effectiveness of USDA inspections. In enforcing the Animal Welfare Act, "the agency performs inspections of license facilities and publishes those inspection reports on its website." Id. The public – like the inspectors – "can compare the number of animals reported [in the Forms] to the number of animals viewed at a facility [during inspections]." Id. at 7, A.R. 5531. The public – like the inspectors – can thus "question the accuracy of the gross amount reported based on the number of animals bought and sold and the animals seen on inspection." Id. If the public spots discrepancies that the USDA appeared to miss, USDA inspectors may be neglecting their jobs. Third, disclosure would help the public evaluate whether the agency is properly

14

assessing licensing fees:  "Members of the public can use the gross dollar amount from regulated

activities to analyze whether the agency is properly assessing fees in accordance with its

regulations."  Id.

Plaintiffs complain that those public interests were not alleged by the Humane Society

(the FOIA requester), unsupported by the record, unrelated to the actual Block 8 information in

dispute, and divorced from the Humane Society's intended use of the information.  The Court

takes each issue in turn.

a.      Burden to Show Public Interest

According to Plaintiffs, the FOIA requester has the burden to show a public interest

under Exemption 6, but here the USDA relied on public interests that the Humane Society had

not offered.  Plaintiffs are correct that in a traditional FOIA case, if a FOIA requester asserts a

public interest in uncovering Government deficiencies or misfeasance, the requester must

produce evidence to support that public interest.  See, e.g., Smith v. Dep't of Labor, 798 F. Supp.

2d 274, 285 (D.D.C. 2011); see also Nat'l Archives & Records Admin. v. Favish, 541 U.S. 157,

172 (2004) (requester bears such a burden in Exemption 7(C) cases); Dep't of Def. v. FLRA, 510

U.S. at 497 n.6 (Exemption 6 public interest inquiry parallels Exemption 7(C) inquiry).  That

traditional rule is built on deference to the agency.  See Favish, 541 U.S. at 174 ("there is a

presumption of legitimacy accorded to the Government's official conduct").  In addition, the

traditional rule facilitates judicial review.  See id. at 174-75 ("Only when the FOIA requester has

produced evidence sufficient to satisfy this standard will there exist a counterweight on the FOIA

scale for the court to balance against the cognizable privacy interests in the requested records.

Allegations of government misconduct are easy to allege and hard to disprove, so courts must

insist on a meaningful evidentiary showing.") (citation and internal quotation marks omitted).

But this is a <u>reverse</u>-FOIA case.  When the agency itself provides a sufficient public interest, it would make no sense to reject that interest on the ground that it came from the agency's mouth.  In practice, Plaintiffs' rule would add nothing but delay: after dismissal, a FOIA requester could add a single paragraph parroting the interests asserted by the agency and then refile its request.  The Court sees no reason to impose that formalistic hurdle.  The concerns that motivate the burden rule in a traditional FOIA case, moreover, have no place in reverse-FOIA.  Deference to an agency cuts the other way when the agency finds that the public interests outweigh the private ones; indeed, rejecting a public interest <u>because</u> it was offered by the agency would undercut, not bolster, the agency.  And judicial review poses no problem; a public interest put forth by an agency – just as much as a public interest put forth by a requester – counters the weight of the private interests on a court's FOIA scales.  In sum, an agency may independently assert a public interest under Exemption 6 in a reverse-FOIA suit.

b.      Record Evidence Supporting Public Interests

Plaintiffs next challenge the lack of record support for any public interest.  The primary record evidence supporting the second and third public interests is an e-mail by Dr. Betty Goldentyer, the Eastern Regional Director for the Animal Care unit of APHIS.  <u>See</u> E-mail from Betty Goldentyer, USDA, to Anastazia Taylor, USDA (Feb. 15, 2012), A.R. 5538.  Plaintiffs raise two objections to Dr. Goldentyer's e-mail.  First, Plaintiffs ask that the e-mail "be stricken from the Administrative Record" because the e-mail was not included in the first draft of the record exchanged by the parties.  <u>See</u> Pls.' Reply at 23-28.  The e-mail, however, was included in the final Administrative Record filed in this Court and was part of the evidence before the USDA when it made its decision; it thus plainly belongs in the record.  Second, Plaintiffs claim that they should have been given an opportunity to comment on the e-mail during proceedings before the

16

USDA.  Yet reverse-FOIA actions "are in the nature of informal adjudications," Occidental

Petroleum, 873 F.2d at 337, and in such adjudications, "agencies must satisfy only minimal

procedural requirements.  An agency conducting an informal adjudication has no statutory

obligation to prematurely disclose the materials on which it relies so that affected parties may

pre-rebut the agency's ultimate decision."  Sw. Airlines Co. v. TSA, 650 F.3d 752, 757 (D.C.

Cir. 2011) (citation and internal quotation marks omitted); see also Pension Benefit Guar. Corp.

v. LTV Corp., 496 U.S. 633, 655 (1990).  The USDA made no error here.

c.     Connection Between Forms and Public Interests

Next, Plaintiffs challenge each of the three public interests that the USDA identified.  For

the first – deciding whether the USDA is following Congress's directives to collect "reasonable"

fees and to assess them on an "equitable basis" – Plaintiffs claim that it is the regulations that set

out the fees, not the Forms at issue here, that are relevant.  The regulations divide breeders into

seven fee categories based on a breeder's gross revenue: up to $500; $500 to $2000; $2000 to

$10,000; $10,000 to $25,000; $25,000 to $50,000; $50,000 to $100,000; and over $100,000.  See

9 C.F.R. § 2.6(c) tbl.1.  That fee schedule alone does not disclose whether the fees are

"reasonable" and set on an "equitable basis"; the public must also know how many breeders fall

into each category.  For example, if most breeders are in the top category (over $100,000) and a

substantial portion of them have more than $1,000,000 in revenue, perhaps setting "reasonable"

fees on an "equitable basis" requires the USDA to break the top category up to distinguish large

from very large breeders.

For the second public interest – assessing the accuracy of USDA inspections – Plaintiffs

say that the Block 8 information will prove worthless: the Forms disclose annual dog turnover,

while the inspections present only a snapshot – the number of dogs at the facility on a single day

17

(the day of the inspection).  As Plaintiffs note, "There always will be a discrepancy between the two numbers."  Pls.' Reply at 31-32 (emphasis in original).  But of course those numbers are correlated in a way that could advance public monitoring.  For example, if inspectors report 100 dogs on the premises, while the dealer claims on her Form that she bought and sold only 5 dogs in the last year, and yet the USDA pursues no enforcement action, a citizen may reasonably doubt the inspectors' diligence.

For the third public interest – monitoring the USDA's assessment of fees – Plaintiffs again argue that the Forms will be no help; they reveal what the dealer initially paid, not whether the USDA has taken any enforcement action.  Once again, although the Forms paint only a partial picture, that peek could still help the public assess the USDA.  The Forms disclose amounts that determines the license fee – that is, the dealer's revenue (for a breeder) and the dealer's revenue minus the amount paid for the dogs (for most other dealers).  See 9 C.F.R. § 2.6(c) tbl.1.  The Forms also disclose the fee that the breeder actually paid.  So just from the Forms, the public can check whether an initial payment by a dealer complies with the fee schedule.  The USDA also releases who holds an active license.  See APHIS, Animal Care Information System Search Tool, USDA, http://acissearch.aphis.usda.gov/LPASearch/faces/ CustomerSearch.jspx (last visited Sept. 20, 2012).  So the public can also track if dealers who initially underpay still hold active licenses.  As Plaintiffs note, an underpayment on the Form coupled with an active license does not necessarily mean the USDA has dropped the ball; the USDA could take corrective action out of the public's eye.  But the USDA was not unreasonable in concluding that disclosure here will at least help the public evaluate whether it is properly assessing fees.

d.       Humane Society's Intended Use of Information

Finally, Plaintiffs object that "there is no public interest in disclosure where the requester only seeks the information for its own, personal use"; the USDA, accordingly, should have considered "the reason the requester (HSUS) has asked for the information."  Pls.' Mot. at 31. The Supreme Court, however, has directly and definitively deemed such intentions irrelevant:

> [W]hether an invasion of privacy is warranted cannot turn on the purposes for which the request for information is made.  Because Congress clearly intended the FOIA to give any member of the public as much right to disclosure as one with a special interest in a particular document, except in certain cases involving claims of privilege, the identity of the requesting party has no bearing on the merits of his or her FOIA request.

Dep't of Def. v. FLRA, 510 U.S. at 496 (citations, internal quotation marks, emphasis, and brackets omitted); see also Multi Ag Media, 515 F.3d at 1231 n.2 ("Although Multi Ag may not want the information to check up on the government itself, the use for which the requestor seeks the information is not relevant for purposes of determining the public interest under FOIA Exemption 6.").

The USDA's determination that public interests exist, therefore, cannot be deemed arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.

3.       *Balancing of Private and Public Interests*

Once an agency identifies significant private interests and proper public interests, it must decide whether Exemption 6 covers the information – that is, whether disclosure "would constitute a clearly unwarranted invasion of personal privacy."  5 U.S.C. § 552(b)(6).  "To determine whether release of a file would result in a clearly unwarranted invasion of personal privacy, we must balance the private interest involved (namely, 'the individual's right of privacy') against the public interest (namely, 'the basic purpose of the Freedom of Information Act,' which is 'to open agency action to the light of public scrutiny')."  Horowitz v. Peace Corps,

428 F.3d 271, 278 (D.C. Cir. 2005) (quoting Dep't of the Air Force v. Rose, 425 U.S. 352, 372-73 (1976)). In balancing those interests, "unless the invasion of privacy is 'clearly unwarranted,' the public interest in disclosure must prevail." Dep't of State v. Ray, 502 U.S. 164, 177 (1991). And more generally, "the purpose and plain language of the Act mandate a strong presumption in favor of disclosure." Multi Ag Media, 515 F.3d at 1232 (internal quotation marks omitted).

Emphasizing that the private interests here were relatively slight (particularly for the volume information), the USDA concluded that public interests in disclosing the Block 8 information outweighed the private interests in withholding it. See Final USDA Letter 7, A.R. 5531. Plaintiffs complain that the USDA ignored alternatives to disclosure and that it went astray in striking the final balance.

a.        Alternative Means of Disclosure

"The availability of information through other sources lessens the public interest in its release through FOIA." Horowitz, 428 F.3d at 278. "While certainly not a *per se* defense to a FOIA request, consideration of 'alternative means' is an aspect of the balancing of interests conducted pursuant to Exemption 6 of the FOIA." Dep't of Def. Dep't of Military Affairs v. FLRA, 964 F.2d 26, 30 (D.C. Cir. 1992) (emphasis in original). Plaintiffs suggest two alternatives here.

First, instead of disclosing the individual Forms, the USDA could release aggregated data: "the aggregated total number of puppies bought and sold by all USDA-licensees in the United States, the total amount of money paid and received by such licensees, and the total amount of license fees received by USDA." Pls.' Mot. at 37. FOIA, however, "does not obligate agencies to create or retain documents; it only obligates them to provide access to those which it in fact has created and retained." Kissinger v. Reporters Comm. for Freedom of the

Press, 445 U.S. 136, 152 (1980).  To provide aggregated data, the USDA would have to "create" a document with the aggregation.  Aggregated data, moreover, would prove a poor substitute for the requested Forms.  The public interests here depend on disclosure of individual Forms.  It is the individual Form – not aggregated data – that will reveal which fee schedule a dealer falls into.  And it is the individual Form – not aggregated data – that the public can cross-reference with USDA databases.  So while the USDA recognized the aggregation alternative, see Final USDA Letter 6, A.R. 5530, it was not arbitrary and capricious for the USDA to reject it.  Nor, given the obvious inadequacies of aggregated data, is there any hint of "prejudicial error."  5 U.S.C. § 706.

Second, Plaintiffs propose that the USDA could redact dealers' names and addresses before releasing the Forms.  That way, nothing would link the Block 8 information to an individual person and her finances.  But redacted names and addresses are not quite the panacea that Plaintiffs imagine: without a name or address, the public could not cross-reference the Forms with the USDA's databases.  In any event, Plaintiffs admit that they did not propose this alternative until "after USDA's decision was rendered."  Pls.' Mot. at 37.  "It is a hard and fast rule of administrative law, rooted in simple fairness, that issues not raised before an agency are waived and will not be considered by a court on review."  Nuclear Energy Inst., Inc. v. EPA, 373 F.3d 1251, 1297 (D.C. Cir. 2004).  Because Plaintiffs did not propose this second alternative to the USDA when given a chance, Plaintiffs have forfeited that aspect of their challenge.

     b.   General Balancing

The USDA ultimately concluded that disclosure will give minimal insight into Plaintiffs' personal finances, and that those slight invasions of privacy are not "clearly unwarranted" in light of the public monitoring of the USDA that disclosure would advance.  Plaintiffs claim that

the USDA struck the wrong balance under Exemption 6, affording the private interests too little

weight and affording the public interests too much.  The question here, it is important to

emphasize, is not how this Court would weigh the interests *de novo*.  Rather, the question is only

whether the USDA's balancing was arbitrary, capricious, or an abuse of discretion.  <u>See</u> 5 U.S.C.

706(2)(A).

As to the private interests, Plaintiffs point out that the D.C. Circuit – in a traditional

FOIA case – concluded that doctors have a substantial privacy interest in the payments they

receive from Medicare, even when their expenses remain secret:  "[I]nformation need not reveal

completely an individual's personal finances to implicate substantial privacy concerns."

<u>Consumers' Checkbook Ctr. for the Study of Servs. v. Dep't of Health & Human Servs.</u>, 554

F.3d 1046, 1051 (D.C. Cir. 2009).  Yet the USDA likewise found a substantial privacy interest

here, so on that point <u>Consumers' Checkbook</u> hardly undermines the agency.  In addition,

because the <u>Consumers' Checkbook</u> court found no valid public interest in disclosure (and thus

never had to balance interests), the case provides little guidance on how to weigh the private

interest in such revenue information, let alone guidance on whether the USDA's weighing here

was arbitrary and capricious.  Plaintiffs also claim that the USDA should have factored the

Humane Society's alleged vendetta against Missouri dog dealers into its assessment of the

private interests here.  But Plaintiffs omit the crucial link: they do not explain how the

information sought here would further that crusade and cause additional harm to Plaintiffs.

On the other side of the scales, Plaintiffs note that the information disclosed in <u>Multi Ag</u>

<u>Media</u> was more helpful for public monitoring; unlike the information in dispute here, the <u>Multi</u>

<u>Ag Media</u> information closely paralleled the information it would be checked against.  <u>See</u> 515

F.3d at 1232.  Contrary to Plaintiffs' assertions, <u>Multi Ag Media</u> does not set the floor on public

interests.  How strong the public interest needs to be depends on how strong the private interest is.  And the public interest here has some heft because "the protection of the public fisc is a matter that is of interest to every citizen."  Brock v. Pierce County, 476 U.S. 253, 262 (1986); see also Multi Ag Media, 515 F.3d at 1232.  When it comes to evaluating fee assessments, that interest is undeniably implicated.

At the end of the day, Section 706 sets a tough standard – a standard Plaintiffs have not come close to meeting.  As set forth in Sections III.B.1 and III.B.2, the USDA considered the private interests here fairly slight and the public interests more substantial.  As the USDA's balancing was not arbitrary or capricious, the Court cannot find that Exemption 6 protects against disclosure.  Accord Bartholdi Cable Co. v. FCC, 114 F.3d 274, 282 (D.C. Cir. 1997).

## IV.  Conclusion

For the aforementioned reasons, the Court will grant Defendant's and Defendant-Intervenor's Motions for Summary Judgment and deny Plaintiffs' Motion for Summary Judgment.  A separate Order consistent with this Opinion will be issued this day.

/s/ James E. Boasberg
JAMES E. BOASBERG
United States District Judge

Date:  September 20, 2012